Christopher Orkins,

       Plaintiff,

       v.                                Civil Action No. 2:12-CV-68

Michael J. Astrue,
Commissioner of Social Security,

       Defendant.

## REPORT AND RECOMMENDATION
(Docs. 6, 9)

Plaintiff Christopher Orkins brings this action pursuant to 42 U.S.C. § 405(g) of

the Social Security Act, requesting review and remand of the decision of the

Commissioner of Social Security ("Commissioner") denying his application for disability

insurance benefits.  Pending before the Court are Orkins's motion to reverse the

Commissioner's decision (Doc. 6), and the Commissioner's motion to affirm the same

(Doc. 9).  For the reasons stated below, I recommend that Orkins's motion be DENIED,

and the Commissioner's motion be GRANTED.

## Background

Orkins was thirty years old on his alleged disability onset date of January 1, 2009.

(AR 154.)  He attended school through the eleventh grade and has obtained his GED.

(AR 31, 198.)  He has work experience as a concrete worker, a painter, an industrial

cleaner, a machine operator, a maintenance worker, a housekeeper, a stock handler, and a

cook.  (AR 198, 243, 258.)  Orkins testified that many of these jobs were short in duration because he would leave for better-paying jobs.  (AR 36.)  Orkins has a son but does not provide care for him.  (AR 29, 206.)  At the time of the administrative hearing, he was living in an apartment with his girlfriend.  (AR 43.)

On October 21, 2006, Orkins presented to the emergency room with severe head pain, headache, nausea, blurred vision, and dizziness.  (AR 276.)  He had a loss of consciousness, multiple contusions, and a concussion.  (AR 276-77.)  He told medical personnel that his injuries were the result of an assault by police officers on the prior evening.  (AR 276.)  He was discharged later that day, "ambulatory and stable," and given Percocet for pain.  (AR 277.)  On May 23, 2008, Orkins again visited the emergency room, this time complaining of left ankle pain and mild facial and neck pain after a motor bike accident.  (AR 433.)  After his abrasions were cleaned and medication was prescribed, Orkins was discharged in "[s]table" condition.  (AR 435.)  Orkins visited the emergency room numerous times in 2009 and 2010.  For example, in January 2009 and January 2010, he was admitted for complaints of headaches, double vision, and dizziness.  (AR 391, 410.)  A CT scan of the head was done in January 2010, revealing negative results.  (AR 392.)  EEG testing was normal.  (AR 366.)  Despite Orkins's 2006 and 2008 injuries and his multiple subsequent trips to the emergency room, he continued to work, at least on a part-time basis, until approximately September 2009.  (AR 197.)

In September 2010, Orkins filed applications for supplemental security income and disability insurance benefits.  (AR 154-64.)  In his disability application, Orkins alleges that, starting on January 1, 2009, he has been unable to work due to the following

conditions: concussion syndrome, coordination problems, chronic headaches, vision problems, dizziness, seizures, chronic earaches and ear bleeds, knees that "give out," sleeping problems, and memory problems. (AR 197.) Orkins testified at the administrative hearing that he has been unable to work because he has trouble concentrating and remembering instructions; he has severe headaches causing dizziness and lack of balance; he is clumsy; he has double vision and bad hand-eye coordination; and he becomes angry and frustrated even over little things. (AR 36-37, 40-41.)

Orkins's application was denied initially and upon reconsideration, and he timely requested an administrative hearing. The hearing was conducted on August 11, 2011 by Administrative Law Judge ("ALJ") Dory Sutker. (AR 21-59.) Orkins appeared and testified, and was represented by counsel. On August 26, 2011, the ALJ issued a decision finding that Orkins was not disabled under the Social Security Act from his alleged onset date of January 1, 2009 through the date of the decision. (AR 8-20.) Thereafter, the Appeals Council denied Orkins's request for review of the ALJ's decision, rendering that decision the final adjudication of the Commissioner. (AR 1-4.) Having exhausted his administrative remedies, Orkins filed the Complaint in this action on April 3, 2012. (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Sutker first determined that, although Orkins had engaged in limited work activity subsequent to his alleged disability onset date, he had not engaged in "substantial gainful activity" since that date. (AR 10.) At step two, the ALJ found that Orkins had the severe impairment of "headaches, status post closed head injury." (*Id.*) Conversely, the ALJ found that Orkins's asthma, ear problems, and mental impairments of depression and post-traumatic stress disorder were non-severe. (AR 11-12.) At step three, the ALJ found that none of Orkins's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 12-13.) Next, the ALJ determined that Orkins had the RFC to perform "a full range of work at all exertional levels" but was limited to performing only "routine and uncomplicated tasks." (AR 13.) Given this RFC, the ALJ found that Orkins was unable to perform his past relevant work as a dry-waller, a painter, a housekeeper, an industrial cleaner, a maintenance worker, or a stock handler. (AR 19.) Nonetheless, applying the applicable section of the Medical-Vocational Guidelines, the ALJ decided that Orkins was able to perform jobs existing in significant numbers in the national economy. (*Id.*) The ALJ concluded that Orkins had not been under a disability from the alleged onset date of January 1, 2009 through the date of the decision. (AR 20.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A).  A person will be found disabled only if it is determined that his

"impairments are of such severity that he is not only unable to do his previous work[,] but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a

"review [of] the administrative record *de novo* to determine whether there is substantial

evidence supporting the . . . decision and whether the Commissioner applied the correct

legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v.

Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual

review of the Commissioner's decision is limited to determining whether "substantial

evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.

Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d

Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the fact[-]finder.").  "Substantial evidence" is more

than a mere scintilla; it means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should consider that the Social

Security Act is "a remedial statute to be broadly construed and liberally applied."

*Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>**Analysis**</u>

I.    **Step-Two Determination Regarding Severity of Impairments**

As noted above, at step two of the sequential evaluation, the ALJ determined that Orkins's "headaches, status post closed head injury" constituted a "severe impairment." (AR 10.) Orkins asserts that the ALJ erred in failing to recognize that Orkins's traumatic brain injury ("TBI") was also a severe impairment. The argument fails for several reasons.

First, the ALJ's omission of the term "traumatic brain injury" or "TBI" in her step-two analysis is immaterial, as the ALJ clearly considered the symptoms of Orkins's TBI in that analysis and merely used a different term—"closed head injury"—to describe the same condition. Specifically, the ALJ stated:

> [Orkins's] . . . impairment of headaches, *status post closed head injury*, significantly limit[s] his ability to perform basic work activities and therefore constitutes a "severe impairment" . . . . [Orkins's] records show that he suffered a *head injury* in October 2006. His medical records show complaints of headaches, vision disturbances[,] and decreased concentration. In addition, his records show that he has complained of seizures. Further, cognitive testing shows mild-moderate deficits of perception and discrimination in noise and mild to moderate deficits in organization and simple sequencing, resulting in significant functional limitations in auditory processing.

(AR 10-11 (citations omitted) (emphases added).) The Commissioner correctly points out that the references to "TBI" in Orkins's medical records include a parenthetical reference to ICD-9 Code "854.00" (AR 483, 486, 493, 496, 498), which the Centers for Medicare & Medicaid Services ("CMS") defines as an "intracranial injury . . . *without open intracranial wound*," CMS, http://www.cms.gov/medicare-coverage-

database/staticpages/icd9-code-range.aspx?DocType=LCD&DocID=28544&ver=

148&Group=1&RangeStart=854.00&RangeEnd=854.19 (last visited Dec. 4, 2012)

(emphasis added).  Thus, the type of TBI that Orkins's medical providers recorded

Orkins was suffering from derived from a non-open head wound.  Given that the ALJ

explicitly considered Orkins's "closed head injury" at step two, finding it to be a severe

impairment (AR 10-11), the ALJ did not err by failing to recognize Orkins's "traumatic

brain injury" or "TBI" as a severe impairment.

Second, the ALJ considered Orkins's TBI (and referenced the condition in those

terms) in her assessment of Orkins's RFC, stating for example: "Although recent records

note a past history of *traumatic brain injury*, the medical evidence of record does not

actually reflect evidence supporting this finding."  (AR 14 (citations omitted) (emphasis

added).)  An ALJ's omission of an explicit finding regarding a step-two impairment does

not require remand where the omitted impairment was accurately accounted for in the

ALJ's RFC determination.  *See Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th

Cir. 2003); *Swanson v. Astrue*, No. 2:10-CV-217, 2011 WL 2582617, at *8 (D. Vt. June

29, 2011) (collecting cases).  Here, the ALJ considered Orkins's TBI-related symptoms

in detail in the context of her RFC determination.  Specifically, the ALJ cited Orkins's

coordination problems; chronic headaches; vision problems; seizures; and difficulty

remembering, concentrating, and completing tasks.  (AR 14.)  The ALJ then discussed

Orkins's limitations arising from these symptoms.  (AR 14-18.)  Finally, the ALJ

determined, based on these symptoms and limitations, that Orkins would be limited to

performing only "routine and uncomplicated tasks."  (AR 13, 15-16.)

Third, the ALJ's assessment of Orkins's TBI is supported by substantial evidence. The ALJ accurately discussed in her decision that medical records from around the date of the original alleged assault, October 20, 2006, make no mention of a "traumatic brain injury," and in fact explicitly rule out acute abnormality in the brain. (AR 14.) For example, a diagnostic report from October 21, 2006 states that there was "no intracranial hemorrhage or extra[-]axial fluid collection" and "[n]o acute intracranial traumatic changes." (AR 278.) Another report from the same date states: "There is no evidence for acute abnormality in the brain such as bleed or shift. . . . No skull fractures seen." (AR 279.) A report from a few days later records that Orkins's "abrasions" were "mainly healed" and "quite flat, without hematoma," and that his head had "no significant contusions palpated." (AR 273.) The report further records that Orkins "basically" felt "well" except for having tenderness in one area; thus the doctors "advise[d] him that he could go back to work." (*Id.*) The ALJ explicitly considered these facts, stating:

> [Orkins's] diagnosis in the emergency room following [his October] 2006 accident was multiple contusions status post alleged assault and concussion. Follow[-]up records regarding his head contusion show minimal impact, with well-healed abrasions without hematoma on his face, no significant contusions palpated and normal neurological examination with no focal motor deficit. CT imaging of [Orkins's] head conducted soon after the accident . . . revealed no acute intracranial traumatic changes, and subsequent CT imaging conducted in November 2008 to investigate his complaints of double vision and dizziness also were negative. [Orkins's] cognitive testing at the consultative examination reveals no cognitive impairment, with adequate short-term immediate recall and attention and concentration and the ability to follow a three-step command. In addition, although [Orkins's] records show some complaints of numbness, there is no indication of clinical findings supporting this complaint.

(AR 14 (citations omitted).) The ALJ also accurately noted that Orkins's neurological

examinations had been "mostly normal, with good motor and sensory findings." (*Id.*; *see* AR 353, 448, 484, 486.) And finally, the ALJ correctly recorded that, after performing a neuro-ophthalmology examination in February 2009, ophthalmologist Dr. Susan Marie Pepin stated "that there is 'no corneal, lenticular[,] or retinal pathology to explain [Orkins's]' complaints, and that [Orkins] has 'normal ocular motility without evidence of cranial neuropathy or other motility disturbance.'" (AR 15 (quoting AR 316).) Dr. Pepin further stated that Orkins had "20/20 [vision] in both eyes," and that "[b]oth his anterior and posterior exam[s] show[ed] no abnormalities." (AR 316.)

Orkins points out that the ALJ incorrectly stated at step two of her decision that "cognitive testing show[ed] *mild-moderate* deficits of perception and discrimination in noise" (AR 11 (emphasis added)), when in fact the "testing" referred to by the ALJ showed "*moderate-severe* deficits of perception [and] discrimination [and] attention in noise" (AR 460 (emphasis added)). The mistake was harmless, however, given that the ALJ correctly concluded that the testing demonstrated "significant functional limitations in auditory processing." (AR 11 (citing AR 460).) Moreover, the ALJ analyzed this testing later in her decision, accurately summarizing it as "show[ing] moderate to severe deficits," but concluding that it was entitled to only "limited weight" for several reasons. (AR 18.)

## II.     Analysis of Medical Opinions

Next, Orkins contends that the ALJ erred by giving significant weight to the opinions of the agency consultants and limited weight to the opinion of treating physician Dr. Richard Baker. In response, the Commissioner asserts that: (a) Orkins's argument

regarding the agency consultants is based on an incorrect factual premise; and (b) the ALJ properly accounted for Dr. Baker's opinion in determining Orkins's RFC.

## A. Agency Consultant Opinions

The ALJ afforded "significant weight" to the February 2011 assessments of state agency medical consultant Dr. Leslie Abramson and state agency psychological consultant Dr. William Farrell. (AR 17; *see* AR 76-93.) Based on their review of the record, Drs. Abramson and Farrell opined that Orkins had no physical or psychological medically determinable impairment. In making this opinion, the consultants explicitly relied on the following facts: Orkins's MRI, CT, and EEG results were normal; treating primary care physician Dr. Baker did not record any psychological problems; consulting physician Dr. Dean Mooney opined that Orkins had no cognitive impairment; examining neurologist Dr. Stephen Brittain reported that Orkins's memory was normal; and Orkins had normal neurological examinations. (AR 82, 91.) The consultants also noted that the record reflected Orkins had been "inconsistent in his reporting of w[o]rk activity," and was an "inaccurate reporter" with respect to a January 2011 psychological evaluation. (*Id.*)

Citing to *Tarsia v. Astrue*, 418 F. App'x 16 (2d Cir. 2011), Orkins claims that the ALJ erred in affording significant weight to the agency consultants' assessments because "there was no mention [therein] of the neuropsychological TBI test [contained] in the record." (Doc. 6 at 9.) The referenced "test" is the Scales of Cognitive Ability for Traumatic Brain Injury (SCATBI) test, which was administered to Orkins in January 2011 by Barbara Mallen, a certified speech language pathologist. (AR 458-60.) After

administering only approximately half of the test to Orkins (AR 460), Mallen opined in a "[p]reliminary [s]ummation" (AR 458) that the results "to this point suggest that [Orkins] will experience significant functional limitations in auditory processing and the ability to attend to stimuli in noise," which "could compromise [Orkins's] safety [and] task performance [and] impair his functional outcomes" (AR 460). Nevertheless, Mallen stated that Orkins's prognosis was "fair," and included among her long-term (one year) goals for Mallen: "manage functional [activities of daily living] [independently]" and "[p]rocess [and] recall key verbal info[rmation]." (AR 472.)

Orkins's argument fails, and *Tarsia* is inapplicable here, because the record demonstrates that the agency consultants did in fact consider the results of Mallen's TBI test. In *Tarsia*, 418 F. App'x at 18, the court declined to affirm the ALJ's assignment of controlling weight to an agency consultant's opinion, where it was unclear whether the consultant had reviewed all the evidence in formulating his opinion. In contrast, here, the assessments of Drs. Farrell and Abramson explicitly refer to Mallen's summary of the SCATBI test results, stating: "RRMC – 1/11 – SPEECH/LANG – NOTED PROBS WITH ATTEN, RECALL, REASONING, ETC." (AR 81, 90.) It is apparent that this statement refers to Mallen's summary because Mallen is a speech/language pathologist who was affiliated with Rutland Regional Medical Center (RRMC); Mallen opined that Orkins suffered problems with attention and recall; and Mallen's opinion was made in January 2011. (AR 458, 460, 472.)

Orkins also argues that the assessments of the agency consultants should not have been given significant weight because they failed to mention Orkins's TBI diagnosis.

(Doc. 6 at 9.)  But again, Orkins is mistaken, as the assessments state under the heading "PHYSICAL ALLEGATIONS": "History TBI."  (AR 82, 91.)

Orkins correctly points out in his reply that Drs. Abramson and Farrell performed their review of the record before Dr. Baker's August 2011 opinion was added, and thus the consultants could not have considered Dr. Baker's opinion in their assessments. (Doc. 10 at 4-5.)  Citing to another decision of this Court, *Geraw v. Comm'r of Soc. Sec.*, No. 2:11-CV-32, 2011 WL 6415475, at *8 (D. Vt. Dec. 21, 2011), Orkins argues that, given this deficiency, the ALJ should not have afforded significant weight to the agency consultant opinions.  (*Id.*)  But here, unlike in *Geraw*, the agency consultants' assessments are consistent with the record taken as a whole, including the medical evidence, whereas Dr. Baker's August 2011 opinion is unsupported and inconsistent with the record, as discussed below.[1]  Also noteworthy, and as also discussed below, the ALJ did not rely solely on the consultants' opinions in formulating her RFC assessment. Rather, the ALJ considered all the relevant evidence, including Orkins's employer's report, and Orkins's credibility, reliability, compliance with treatment, and daily activities.  (AR 14-16.)

---

[1] This case is also distinguishable from *Tarsia* because there, the evidence omitted from the agency consultant's consideration was a treating physician's diagnosis and recommendation for surgery. *Tarsia*, 418 F. App'x at 18.  Specifically, the court stated that it was unclear whether the agency consultant had seen or considered an "evaluation, radiographic, and diagnostic notes of [a treating] orthopedist who diagnosed [the claimant] with severe degenerative arthritis of the left knee and found her to be a candidate for total knee arthoplasty."  *Id.* (quotation marks omitted).  Dr. Baker's August 2011 opinion does not compare to this type of evidence.  Nor does the opinion indicate that there were any new diagnoses or treatment recommendations, or any worsening of Orkins's condition since the date the consultants made their assessments.

## B.       Treating Physician Opinion

Orkins contends that the ALJ erred in failing to afford controlling weight to the opinion of Dr. Baker, Orkins's treating primary care physician.  Orkins saw Dr. Baker approximately every three months beginning in February 2009, when Orkins complained of headaches, double vision, visual disturbances, and seizures.  (AR 352, 360, 500.)  In a March 2010 treatment note, Dr. Baker referred to Orkins's symptoms as "bizarre," stating that a definitive diagnosis "may be difficult."  (AR 353.)  In treatment notes from March 2010, November 2010, January 2011, and February 2011, despite Orkins's complaints of headaches, seizures, visual disturbances, and dizzy spells; Dr. Baker recorded that Orkins's insight and judgment were intact, and Orkins did not suffer from any psychological or neurological problems.  (AR 352-53, 447-48, 485-87.)  On August 4, 2011, Dr. Baker completed a two-page checklist, checking off 21 categories of boxes corresponding to Orkins's mental ability to function in numerous different areas.  (AR 499-500.)  The Doctor checked off boxes indicating that Orkins had "[s]ubstantial loss" with respect to remembering work-like procedures; was "[s]eriously limited" in 11 of the 21 areas, including maintaining attention, sustaining an ordinary routine, accepting instruction, and interacting with the public; and was "[l]imited" but could function "[s]atisfactor[ily]" in nine of the 21 areas, including carrying out short and simple instructions and making simple work-related decisions.  (AR 499.)  Dr. Baker also checked off a box opining that, on average, Orkins would miss "[a]bout two days [of work] per month."  (AR 500.)

A treating physician's opinion is accorded "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial [record] evidence." 20 C.F.R. § 404.1527(c)(2). But the deference accorded to a treating physician's opinion may be reduced in consideration of other factors, including the length and nature of the treating doctor's relationship with the patient, the extent to which the medical evidence supports the doctor's opinion, whether the doctor is a specialist, the consistency of the opinion with the rest of the medical record, and any other factors "which tend to . . . contradict the opinion." 20 C.F.R. § 404.1527(c)(2)-(6); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.") (citation omitted).

Here, as referenced above, the ALJ afforded only "limited weight" to Dr. Baker's opinion. (AR 17.) After reviewing the record, I find that substantial evidence supports this finding, and that the ALJ correctly applied the regulatory factors listed above, giving "good reasons" for not crediting Dr. Baker's opinion. *See* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998). Specifically, the ALJ gave four good reasons for her allocation of limited weight to Dr. Baker's opinion.

First, the ALJ stated that Dr. Baker's opinion was "conclusory," providing "no explanation of the evidence, diagnoses[,] or symptoms relied on in forming that opinion." (AR 17.)  It is true that Dr. Baker's August 2011 opinion, presented in the form of checkmarks in boxes, is conclusory, as it includes no explanation for the opinions made therein.  (AR 499-500.)  Nor does the opinion state what, if any, symptoms, diagnoses, diagnostic tests, or other evidence supports it.  (*Id.*)  In *Halloran*, 362 F.3d at 31 n.2, the Second Circuit noted that a standardized form, such as the one used by Dr. Baker here, "is only marginally useful for purposes of creating a meaningful and reviewable factual record" if unexplained.  *See* 20 CFR § 404.1527(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.").  Although Orkins correctly points out in his reply that the August 2011 form completed by Dr. Baker is more detailed—and thus deserving of more weight—than the form discussed in *Halloran* (Doc. 10 at 1), the ALJ did not err in finding that the opinions provided by Dr. Baker in the form were devoid of explanation or supporting evidence.  Indeed, despite space being provided at the end of the form for "comments," Dr. Baker provided none, giving no explanation for the boxes he checked therein.  (AR 500.)

The ALJ's second rationale for affording limited weight to Dr. Baker's August 2011 opinion is that it is "inconsistent with [the Doctor's] own treatment notes which show normal neurological and psychiatric examinations, with normal affect, intact insight and judgment, and that [Orkins] was oriented to person, place, and time, and normal sensory examination."  (AR 17.)  As discussed above, the record supports this finding.  (*See, e.g.,* AR 353, 448, 484, 486, 487.)

16

Third, the ALJ reasoned that Dr. Baker's opinion was entitled to limited weight because it is "inconsistent with the medical evidence of record which does not show evidence of cognitive impairment." (AR 17-18.) This was a proper basis for affording less weight to Dr. Baker's opinion. Social Security Ruling ("SSR") 96-2p states that it is "error" for an ALJ to give a treating physician's opinion controlling weight "if it is inconsistent with the other substantial evidence in the case record." SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996). Moreover, "[i]t is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence, and the report of a consultative physician may constitute such evidence." *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (citation omitted). Here, as discussed below, substantial evidence—including the opinions and treatment notes of examining agency consultant Dr. Mooney, non-examining agency consultants Drs. Abramson and Farrell, and examining neurologist Dr. Brittain—supports the ALJ's finding that Dr. Baker's August 2011 opinion is inconsistent with the medical evidence of record.

For example, Dr. Baker's opinion that Orkins had a "[s]ubstantial loss" of ability to remember work-life procedures and a "[s]eriously limited" ability to remember very short and simple instructions (AR 499), is inconsistent with neurologist Dr. Brittain's statement in treatment notes that Orkins's memory was "intact" (AR 364). This opinion of Dr. Baker is also inconsistent with the statement of examining consultant Dr. Mooney that Orkins had "adequate" short-term immediate recall. (AR 479.) Likewise, Dr. Baker's opinion that Orkins had a "[s]eriously limited" ability to understand very short and simple instructions and to maintain attention for two-hour segments (AR 499), is

inconsistent with Dr. Brittain's observation that Orkins's comprehension and cognitive testing were "normal" (AR 364). This opinion of Dr. Baker is also inconsistent with Dr. Mooney's recording that Orkins had "no cognitive impairment," "no difficulty following a three-step command," and "adequate" attention and concentration. (AR 479.) Dr. Baker's opinion is also inconsistent with that of agency consultants Drs. Abramson and Farrell, who, as discussed above, determined based on their review of the record that Orkins had no medically determinable impairment. (AR 82-83, 91-92.)

Orkins asserts that Dr. Baker's opinion is supported by the opinion of Gail Porter-Beckley, a vocational rehabilitation counselor, who stated that Orkins was "not capable of working in a competitive employment environment in any capacity" and was "extremely unlikely to become so within the next few years, if ever." (AR 450.) But even Porter-Beckley herself admitted that Orkins's condition "ha[d] not been medically documented in its specifics." (*Id.*) Moreover, the ALJ could not afford significant weight to Porter-Beckley's statement that Orkins was not capable of working; the Second Circuit has held that even "[a] treating physician's statement that the claimant is disabled cannot itself be determinative," *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir.1999), given that it is the Commissioner who is "responsible for making the determination or decision about whether [the claimant] meet[s] the statutory definition of disability," 20 C.F.R. § 404.1527(d)(1). *See* SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996) ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance."). More importantly, as noted by the ALJ (AR 18), Porter-Beckley was a counselor, and not a physician, psychologist, or other

"acceptable medical source," as defined in the regulations. 20 C.F.R. § 404.1513(a).

Therefore, the ALJ was not required to evaluate her opinion in the same manner as

required under the treating physician rule.[2] 20 C.F.R. § 404.1527(d)(2); *see* SSR 06-03p,

2006 WL 2329939, at *2 (Aug. 9, 2006); *Duran v. Comm'r of Soc. Sec.*, 296 F. App'x

134, 136 (2d Cir. 2008) (finding no error in ALJ decision to disregard assessment of

"medical records physician" because it was not from an acceptable medical source and

did not include clinical findings).

Orkins contends that Dr. Baker's opinion is supported by Dr. Mooney's

assessment of a Global Assessment of Functioning ("GAF") score of 50, which indicates

serious symptoms or impairments.[3] (AR 481.) But Dr. Mooney also states in his

assessment that: (a) the information provided by Orkins was "not reliable"; (b) the test

results were "not believed to be an accurate representation of [Orkins's] . . . functioning";

(c) Orkins had no cognitive impairment; (d) a diagnosis of malingering could not be ruled

out; (e) "there [wa]s insufficient evidence to make a clinical diagnosis"; and (f) with

counseling, Orkins could "learn ways to cope with his . . . condition." (AR 475, 479,

481.) Considering Dr. Mooney's assessment as a whole, I do not find that it supports Dr.

---

[2] For the same reason, the ALJ was not required to give deference to the opinion of speech language pathologist Mallen. (*See* AR 458-60.) In any event, the ALJ gave good reasons for affording only "limited weight" to Mallen's opinion: the opinion is not supported by the record; the test results are not based on complete and reliable testing; and the findings of severe deficits of sustained concentration and auditory processing are in "sharp contrast" to the findings of Dr. Mooney in his consultative examination performed in the same month. (AR 18.)

[3] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d at 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 32 (4th ed. 2000)). A score of "41-50" indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

Baker's August 2011 opinion.

The ALJ's fourth and final reason for affording only limited weight to Dr. Baker's opinion is that the opinion is "inconsistent with [Orkins's] employer's opinion regarding [Orkins's] ability to work." (AR 18.) Earlier in her decision, the ALJ accurately summarized a Job Screening Questionnaire signed by Robert Stillwell of B&K Modern Drywall, Orkins's former employer. (AR 17 (citing AR 213-14).) Therein, Stillwell indicated that Orkins had been a laborer/painter for the company for approximately four-to-six years; and generally had no problems learning job duties, adapting to work changes, performing repetitious tasks, understanding and carrying out simple directions in a reasonable amount of time, understanding and following guidelines, and maintaining acceptable attendance. (AR 213-14.) Stillwell further indicated that Orkins voluntarily quit the job, rather than being terminated for any reason related to his TBI symptoms. (AR 213.) The record demonstrates that Orkins worked for this employer both before and after his October 2006 head injury (AR 172-73), but Stillwell did not mention any difference in Orkins's performance after the injury. In fact, the record demonstrates— and the ALJ properly considered—that Orkins worked extensively after the 2006 injury, and even after the alleged disability onset date of January 2009.[4] (AR 16, 17, 197, 301, 342, 344, 348, 350, 396, 408.) It was proper for the ALJ to consider this evidence in determining what weight to afford Dr. Baker's opinion. *See* 20 C.F.R. § 404.1527(c)(4) ("[T]he more consistent an opinion is with the record as a whole, the more weight we will

---

[4] Of note, many of the medical records which record that Orkins worked after the 2006 injury contain no reference to Orkins's TBI-related symptoms.

give to that opinion."); 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996) (listing "[w]ork evaluations" as "relevant evidence" in determining RFC); *Williams v. Chater*, 923 F. Supp. 1373, 1379 (D. Kan. 1996) ("Evidence of employment during a period of alleged disability is highly probative of a claimant's ability to work.").

Although in many cases it is most appropriate for the ALJ to give less weight to the opinions of non-examining agency consultants like Drs. Abramson and Farrell than to those of treating physicians like Dr. Baker, this determination must be made on a case-by-case basis. The regulations clearly permit the opinions of non-examining agency consultants to override those of treating sources, when the former are supported by evidence in the record and the latter are not. *See* SSR 96-6p, 1996 WL 374180, at *3 (1996) ("In appropriate circumstances, opinions from State agency . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."). In this case, the consulting physicians' opinions are supported by the evidence of record, and Dr. Baker's August 2011 opinion is unsupported and inconsistent with the evidence, including his own treatment notes. Therefore, I find that it was proper for the ALJ to give more weight to the opinions of consultants Drs. Abramson and Farrell than to that of treating physician Dr. Baker.

## III. RFC Determination

Orkins's final argument is that the ALJ's RFC determination is flawed because the ALJ failed to include additional limitations that were implied by evidence relied on in the ALJ's decision. (Doc. 6 at 17-18.) Based on my review of the record, I disagree, and find that the ALJ's RFC determination is supported by substantial evidence. I further find that the ALJ's consideration of the record in determining Orkins's RFC complied with the regulations, which provide that the ALJ must assess the claimant's RFC "based on *all* the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1) (emphasis added).

The ALJ's RFC determination is partially supported by her credibility assessment, which Orkins does not dispute. Specifically, the ALJ stated: "[Orkins's] statements concerning the intensity, persistence[,] and limiting effects of [his alleged] symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." (AR 14.) The ALJ explained that the objective medical evidence, particularly from the period immediately following Orkins's October 2006 injury, was "not consistent with [Orkins's] alleged severity of symptoms and limitations." (*Id.*) As discussed above, substantial evidence—including normal CT scans, neurological examinations, EEG testing, and eye examinations—supports this finding. (*See, e.g.,* AR 273-74, 278-79, 316, 353, 364, 411-12, 418, 448, 484, 486-87.)

The ALJ also considered evidence indicating that Orkins was not a reliable reporter of his symptoms and may have been malingering. (AR 15.) Specifically, the ALJ accurately recorded that a treatment note from emergency room physician Dr. Scott

Graham states that Orkins's complaints of double vision "indicate [Orkins] is either malingering or . . . is not able to fully express what type of symptoms he is experiencing." (AR 15 (quotation marks omitted) (citing AR 411-12).) The ALJ also correctly recorded that a treatment note from another emergency room physician, Dr. H. Brandon Ayre, states that Orkins's "level of pain does not seem to be commensurate with his physical examination and/or vital signs." (AR 15 (citing AR 394); *see also* AR 313 (consulting physician Dr. James Saunders stating, after examination, that "[Orkins's] level of pain seems out of proportion to the [newly-diagnosed ear] disease.").) The ALJ further accurately recited Dr. Mooney's opinion that Orkins "should not be considered a reliable reporter, as much of the medical information he reported does not correspond to medical records provided." (AR 16 (citing AR 474).) Also, the ALJ correctly quoted the June 2009 findings of Dr. P. Tate Maddox, an ENT physician, that "'no physical exam findings . . . correlate[d] with'" Orkins's alleged pain. (AR 11 (quoting AR 328).)

Another proper consideration of the ALJ in assessing Orkins's RFC was that Orkins had a history of "noncompliance [with recommended treatment] and missed appointments." (AR 15.) The ALJ noted that Orkins had missed at least six appointments in 2011, and had a gap in treatment from March until July of that year. (*Id.*) Evidence of Orkins's noncompliance with treatment is supported by substantial evidence in the record (*see, e.g.,* AR 458, 473, 494, 495), and such noncompliance may serve as a basis for dismissing a claimant's subjective complaints. *See Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir. 2001); 20 C.F .R. § 404.1530(b) ("If you do not follow the prescribed treatment without good reason, we will not find you disabled.").

The ALJ also appropriately considered Orkins's daily activities in assessing his

RFC. The ALJ stated:

> [Orkins's] daily activities are consistent with the above [RFC] assessment and are inconsistent with disabling levels of pain. Although he alleges disabling symptoms as of January 2009, . . . his records show that during 2009, he was still working for a drywall service performing "extremely heavy lifting." While [Orkins] alleges that he was unable to perform all of the job duties of this job due to his impairments, his employer indicates that [he] quit the job and that he was performing the duties of the job. There is no noted reason for a sudden worsening of symptoms as of the alleged onset date, and he was able to work for several years following his head injury. . . . [Orkins] reports in his Disability Report that he is attending classes at Community College of Vermont. In addition, he reports that he is able to independently handle most daily activities and socializes on a regular basis. Also, although his head injury occurred in 2006, his records show that he was actively using motorbikes in 2008 and playing basketball in 2007.

(AR 16 (citations omitted).) There is substantial evidence in the record to support these

findings. (*See, e.g.,* AR 46-47, 50-51, 197, 203, 205-09, 213-14, 235-39, 301, 342, 344,

348, 350, 396, 408.) For example, at the August 2011 administrative hearing, Orkins

testified that he keeps a daily planner, uses a cell phone for scheduling and texting, goes

to the movies and out to dinner with his girlfriend, takes his girlfriend's boss's children to

the park, and does household chores. (AR 46-47, 50-51.) In Function Reports, Orkins

stated that he is able to take care of his personal needs, prepare meals for himself, shop in

stores, and pay bills. (AR 206-08, 236-38.) In a November 2009 medical note, Dr.

Victor Pisanelli noted that Orkins was engaging in "physical exercis[e] outside of work,"

in addition to "working about 25 to 30 hours a week doing sheet[-]rocking."[5]  (AR 344.)

Dr. Pisanelli advised Orkins to "cut back on the recreational exercise program since . . .

his work duties are enough to keep him fit."  (*Id.*)  It is well established that an ALJ may

consider a claimant's daily activities in assessing the claimant's credibility, *see Calabrese*

*v. Astrue*, 358 F. App'x 274, 278 (2d Cir. 2009); SSR 96-7p, 1996 WL 374186, at *5-6

(July 2, 1996); and in fact the regulations provide that a claimant's "pattern of daily

living" is "an important indicator of the intensity and persistence of [the claimant's]

symptoms," 20 C.F.R. § 404.1529(c)(3).  Thus I find that the ALJ's consideration of

Orkins's activities was proper.

Finally, Orkins claims that the ALJ should have included in her RFC

determination the limitations that Orkins was required to work in an environment that

was free of noise and distractions.  (Doc. 6 at 8-9, 18.)  The record does not support these

limitations.  Rather, the record demonstrates that Orkins is capable of performing routine

and uncomplicated tasks in environments containing normal levels of noise and

distractions.  For example, as discussed above, Orkins's employer indicated that Orkins

had no problems performing repetitious tasks or understanding and carrying out simple

directions (AR 214); Dr. Mooney reported that Orkins's attention and concentration were

adequate and that he had "no difficulty" following a three-step command (AR 479); Dr.

Brittain found that Orkins had normal cognitive abilities and comprehension (AR 364);

---

[5]  At the administrative hearing, Orkins testified that he had "[a]ll the same problems" in the months following his 2006 head injury as he was having at the time of the 2011 administrative hearing. (AR 52.)  He stated: "[A]ll my symptoms that I had back then are the symptoms that I have now."  (AR 53.)  But, as discussed above, the evidence reveals that Orkins was able to—and did—work in the months and years following his 2006 injury.

speech language pathologist Mallen determined that Orkins suffered only mild deficits in auditory comprehension of one-step directions (AR 471); and Dr. Baker opined that Orkins could carry out very short and simple instructions (AR 499).

## Conclusion

For these reasons, I recommend that Orkins's motion to reverse the Commissioner's decision (Doc. 6) be DENIED, the Commissioner's motion to affirm the Commissioner's decision (Doc. 9) be GRANTED, and the decision of the Commissioner be AFFIRMED.

Dated at Burlington, in the District of Vermont, this 21st day of December, 2012.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).